# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**TAMMY GEORGE**

**VERSUS**

**FRESENIUS MEDICAL CARE**
**NORTH AMERICA, ET AL.**

**CIVIL ACTION**

**NO. 15-14-RLB**

**CONSENT CASE**

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Bio-Medical Applications of Louisiana, LLC's ("BMA")[1] Motion for

Summary Judgment. (R. Doc. 31).

Also before the Court is Plaintiff's Motion to and for Leave to Exceed Page Limits and

Motion to Strike the Incorrect Pleading and Allow Filing Out of Time Memorandum in

Opposition to Summary Judgment. (R. Doc. 52).[2]  The motion is opposed. (R. Doc. 53).

## I.    Background

On or about November 21, 2014, Plaintiff filed this proceeding in Louisiana state court

alleging that she was discriminated against by her employer BMA and her direct supervisor

Sheryl Wilcutt in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et*

*seq*. ("Title VII") and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. ("ADA")

(R. Doc. 1-1, "Petition").  Plaintiff alleges that she was subjected to a hostile work environment

based on her race (African-American) and her disabilities (breast cancer and lymphedema).

With regard to her Title VII claims, Plaintiff also alleges that she was retaliated against by her

employer.  BMA removed the action on January 12, 2015. (R. Doc. 1).

---

[1] BMA asserts that it was wrongly identified as "Fresenius Medical Care North America" in the Petition. (R. Doc. 20 at 1).

[2] The text of the motion and accompanying documents are improperly filed upside down.  Despite this improper format, the Court will consider the merits of the motion.

Plaintiff claims that Wilcutt racially profiled her and created a hostile work environment. (Petition, ¶¶ 3, 7).  Plaintiff alleges that she "was made to endure racial slurs which were spoken to her by [Wilcutt]," including the use of the term "Monkeys" to categorize African-Americans. (Petition, ¶ 4).  Plaintiff further claims that her supervisor compelled her to pick up heavy containers despite being aware Plaintiff was diagnosed with breast cancer and lymphedema. (Petition, ¶ 5).  Plaintiff claims she requested relief from lifting or handling objects equal to or in excess of four pounds, which was denied, and had to take FMLA medical leave in September of 2013 as a result of a lifting injury. (Petition, ¶ 6).  Plaintiff further claims she "was constantly blamed for offenses she did not commit, and she was threatened with termination on a daily basis." (Petition, ¶ 6).  Finally, Plaintiff claims that Wilcutt retaliated against her "[w]hen the plaintiff attempted to address concerns regarding the disparate treatment which white employees were not made to endure." (Petition, ¶ 7).

Plaintiff was deposed on January 8, 2016 (R. Doc. 31-4) and February 22, 2016 (R. Doc. 31-5).  No other deposition testimony was taken.

On March 31, 2016, the deadline to file dispositive motions, Plaintiff filed a motion for summary judgment (R. Doc. 29)[3] and BMA filed a motion for summary judgment (R. Doc. 31). BMA filed a timely opposition to Plaintiff's motion for summary judgment on April 25, 2016. (R. Doc. 34).  Plaintiff, however, did not oppose BMA's motion for summary judgment within the 21-day period allowed by Local Rule 7(f).

On August 10, 2016, over four months after BMA filed its motion for summary judgment, and the day before the pre-trial conference, Plaintiff filed into the record an untimely 13-page opposition to BMA's motion for summary judgment. (R. Doc. 50).  The Clerk's Office

---

[3] The Court denied this motion in a separate ruling.

issued a deficiency notice because the filing exceeded the page limitations as provided by Local Rule 7(g). (R. Doc. 51).

At a pre-trial conference held on August 11, 2016, the Court informed Plaintiff's counsel that Plaintiff's opposition would be struck as untimely and that Plaintiff would have to seek leave to file an untimely opposition. (R. Doc. 54). The Court also postponed the trial date until resolution of the pending dispositive motions.

Shortly after the pre-trial conference, Plaintiff filed her motion for leave to file an untimely opposition to BMA's motion for summary judgment. (R. Doc. 52).

## II.    Plaintiff's Motion to File Untimely Opposition

The Court will first address Plaintiff's motion for leave to file an untimely opposition to BMA's motion for summary judgment.

Local Rule 7(f) provides that an opposition to a motion must be filed "within twenty-one days after service of the motion" and that a longer period of time may be provided by the Court only for "good cause" shown. Moreover, Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure provides that "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." In evaluating "excusable neglect," the Court considers "(1) the possibility of prejudice to the other parties, (2) the length of the applicant's delay and its impact on the proceeding, (3) the reason for the delay and whether it was within the control of the movant, and (4) whether the movant has acted in good faith." *Agee v. City of McKinney, Tex.*, 593 F. App'x 311, 314 (5th Cir. 2014) (citing *Salts v. Epps,* 676 F.3d 468, 474 (5th Cir. 2012)). "Proof of good cause requires at least as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the

rules usually does not suffice." *Thrasher v. City of Amarillo*, 709 F.3d 509, 511 (5th Cir. 2013)

(citing *Winters v. Teledyne Movible Offshore, Inc.*, 776 F.2d 1304, 1306 (5th Cir. 1985)).

Upon review of the record and briefing of the parties, the Court concludes that Plaintiff

has not established good cause and/or excusable neglect for leave to file an untimely opposition

to BMA's motion for summary judgment over four months after the filing of the underlying

motion.  Plaintiff's sole argument for the untimely filing is that her counsel's mother died

"within less than one month" prior to the filing of BMA's motion, which cause her counsel's

"inadvertent oversight" with regard to the deadline to file an opposition to BMA's motion. (R.

Doc. 52-1 at 2).[4]

Plaintiff provides no convincing explanation for why her counsel's personal loss prior to

the filing of BMA's motion for summary judgment resulted in an over four-month delay in filing

an opposition to BMA's motion.  Indeed, Plaintiff filed her own summary judgment on March

31, 2016 and her counsel was aware that BMA filed its own motion for summary judgment on

that date.  Plaintiff and her counsel were also alerted that BMA filed a timely opposition to

Plaintiff's motion for summary judgment on April 25, 2016.  Nevertheless, Plaintiff took no

action to file her own opposition or to seek leave to file an untimely one.  Moreover, Plaintiff

filed the parties' joint proposed pre-trial order on July 20, 2016, in which the parties jointly

acknowledged that BMA's motion for summary judgment was "unopposed by Plaintiff." (R.

Doc. 48 at 3).  Inexplicably, Plaintiff did not file her untimely opposition into the record until

three weeks later on August 10, 2016. (R. Doc. 50).

Based on the foregoing, Plaintiff's Motion to and for Leave to Exceed Page Limits and

Motion to Strike the Incorrect Pleading and Allow Filing Out of Time Memorandum in

---

[4] An e-mail correspondence attached to another filing indicates that Plaintiff's counsel's mother died on February 26, 2016. (R. Doc. 30-7).

Opposition to Summary Judgment (R. Doc. 52) is **DENIED** and BMA's Motion for Summary

Judgment is deemed unopposed.[5]

## III.    BMA's Motion for Summary Judgment

### A.    Summary Judgment Standard

Summary judgment shall be granted when there are no genuine issues as to any material

facts and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56.  When

a motion for summary judgment is properly made and supported under Rule 56(c), the opposing

party may not rest on the mere allegations of their pleadings, but rather must come forward with

"specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co.,*

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c)(1).  The non-

movant's evidence is to be believed for purposes of the motion and all justifiable inferences are

to be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986).  However, summary judgment must be entered against the plaintiff, if he or she fails to

make an evidentiary showing sufficient to establish the existence of an element essential to his or

her claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Without a showing sufficient

---

[5] The Court has reviewed Plaintiff's untimely opposition and supporting documents in full.  Even if allowed to remain in the record, Plaintiff's untimely opposition would not change any of the analysis below regarding BMA's motion for summary judgment.  The opposition consists primarily of conclusory assertions of law. (R. Doc. 50). Attached to the untimely opposition is an affidavit asserting conclusions of law, including that Plaintiff was "a victim of discrimination (both racial and disability)"; that "she was the victim of slurs and discrimination, which were both offensive, severe, and pervasive"; "that she was treated indigently on a routine basis"; "that she was the victim of Disability Discrimination"; "that she was subjected to a hostile work environment"; and "that she was terminated as a result of the report of the offensive conduct and was a victim of retaliation." (R. Doc. 50-1). Plaintiff also attaches a document titled a "Concise Statement" that is similarly conclusory and lacking in supported factual assertions. (R. Doc. 50-2).  Where Plaintiff does make specific factual assertions in her opposition, she fails to support any of her factual positions by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).  Likewise, Plaintiff fails to comply with this district's requirement that "[e]ach copy of the papers opposing a motion for summary judgment shall include a separate, short concise statement of the material facts as to which the opponent contends there exists a genuine issue to be tried." LR 56(b).  As Plaintiff fails to support her assertions of fact and fails to properly address BMA's assertions of fact as required by Rule 56(c), the Court may consider any uncontroverted fact asserted by BMA to be "undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2); *see also* LR 56(b) ("All material facts set forth in the statement required to be served by the moving party will be deemed admitted, for the purposes of the motion, unless controverted as required by this Rule.").

to establish the existence of an element essential to the plaintiff's claim, there can be "no genuine issue as to any material fact since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

Local Rule 56(a) provides that "[e]very motion for summary judgment shall be accompanied by a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. The Court need only consider "cited materials" and may ignore other materials in the record. Fed. R. Civ. P. 56(c)(3); *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment. . . .").

Furthermore, only evidence that is competent, or admissible, may be used to support summary judgment. *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012). "'[U]nsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Serna v. Law Office of Joseph Onwuteaka*, P.C., 614 F. App'x 146, 153 (5th Cir. 2015) (quoting *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985)).

### B.    Established Facts

Plaintiff has failed to respond to BMA's "Statement of Material Facts for Which There is No Genuine Dispute to be Tried" submitted pursuant to Local Rule 56(a). (R. Doc. 31-2). The statements of material fact provided in this document are supported by Plaintiff's deposition testimony (R. Doc 31-4; R. Doc. 31-5); the declaration of Lajuanda Daigle, Director of Operations for BMA (R. Doc. 31-3); and various documents from the record (R. Doc. 31-6; R.

6

Doc. 31-7).  As Plaintiff fails to address BMA's assertions of fact as required by Rule 56(c), the

Court considers any uncontroverted fact asserted by BMA to be "undisputed for the purposes of

the motion." Fed. R. Civ. P. 56(e)(2); *see also* LR 56(b) ("All material facts set forth in the

statement required to be served by the moving party will be deemed admitted, for the purposes of

the motion, unless controverted as required by this Rule.").

 The following facts are deemed undisputed and admitted.

 Plaintiff worked for BMA as a Patient Care Technician ("PCT") from 1997 through

2001, and was re-hired as a part-time PCT in 2004. (R. Doc. 37-1, ¶ 2).  At the time of her rehire,

Plaintiff received an Employee Handbook providing, among other things, that any employee who

feels subjected to discrimination or harassment should speak to her supervisor, manager, or local

human resources department, or call the Employee Action and Response Line (the "hotline"). (R.

Doc. 37-1, ¶ 3-6).

 In July 2010, Plaintiff was transferred to a full-time PCT position at BMA's clinic at

Dixon Correctional Institute ("DCI"). (R. Doc. 31-2, ¶ 8).  PCTs such as Plaintiff are "required

to move, with assistance, machines and equipment of up to 200 pounds, and to independently lift

containers of up to 30 pounds. (R. Doc. 31-2, ¶ 15).  As admitted by Plaintiff at her deposition,

lifting items over four pounds was part of her regular job duties as a PCT. (R. Doc. 31-2, ¶ 33).

 From July 2010 to early 2014, Plaintiff and the other PCTs directly reported to Sheryl

Wilcutt, who directly reported to Lajuanda Daigle. (R. Doc. 31-2, ¶¶ 10-12).  In the Fall of 2010,

Plaintiff and two other black PCTs called in to BMA's Human Resources department to

complain that Wilcutt treated two white PCTs more favorably, including by permitting them to

make their own schedules. (R. Doc. 31-2, ¶ 18).  During Daigle's investigation, Plaintiff told

Daigle that she did not think Wilcutt was racist and Daigle could not substantiate the allegations of unequal treatment based on race. (R. Doc. 31-2, ¶¶ 21, 22).

In February 2012, BMA received a complaint from a patient that Plaintiff mistreated him during his dialysis treatments. (R. Doc. 31-2, ¶ 24).  Daigle investigated the complaint by interviewing 12 patients, who stated that Plaintiff threatened to write them up for alleged misconduct. (R. Doc. 31-2, ¶ 25).  Despite instructions by Daigle to treat the patients as a caregiver, and not a security guard, additional complaints from patients and other prisoners continued throughout Plaintiff's employment. (R. Doc. 31-2, ¶ 28).

In May 2012, Plaintiff presented BMA with a doctor's note providing that she was not permitted to lift anything over four pounds in weight in light of her chronic lymphedema.  (R. Doc. 31-2, ¶ 29).

On September 4, 2012, when Wilcutt called Plaintiff to ask her to work on her day off, Plaintiff declined because she had other plans and ultimately Plaintiff hung up on Wilcutt. (R. Doc. 31-2, ¶ 33).

On September 19, 2012, Plaintiff was placed on a Performance Improvement Plan ("PIP") to address her issues with insubordination and challenging her supervisor's decisions, creating a negative environment with staff and patients, and her poor interactions with patients. (R. Doc. 31-2, ¶ 34).  The PIP did not involve a demotion or suspension, and Plaintiff's pay was unaffected. (R. Doc. 31-2, ¶ 35).  Wilcutt and Daigle attempted to schedule a meeting with Plaintiff to discuss the PIP with her; however, Plaintiff went on a medical leave of absence for complications related to her lymphedema, precluding this meeting from taking place. (R. Doc. 31-2, ¶ 37).

On November 27, 2012, Plaintiff returned to work with the same restriction of no lifting over four pounds. (R. Doc. 31-2, ¶ 38).  Plaintiff requested accommodation for her lifting restriction; those accommodations included (1) being excused from lifting in excess of 4 pounds and having her lifting duties be reassigned to other employees or (2) being transferred to the secretary position at the DCI clinic then held by another employee. (R. Doc. 31-2, ¶ 40). Plaintiff then obtained a full-duty release to work from her doctor and returned to work again on December 8, 2012. (R. Doc. 31-2, ¶ 44).

On February 8, 2013, Wilcutt completed a follow-up to Plaintiff's September 2012 PIP. (R. Doc. 31-2, ¶ 45).

On April 16, 2013, Plaintiff called BMA's hotline to complain about Wilcutt. (R. Doc. 31-2, ¶ 46).  Plaintiff testified that she called the hotline to complain that Wilcutt treated black employees differently than white employees, about Wilcutt's unprofessionalism, and that Wilcutt created a hostile work environment because she did not keep employees' confidences. (R. Doc. 31-2, ¶ 46).  Plaintiff further testified that she did not recall making any comments about racial harassment on the call. (R. Doc. 31-2, ¶ 47).  Human Resources responded by interviewing Plaintiff, who alleged "mistreatment" by Wilcutt but did not complain of any conduct that was based on her race. (R. Doc. 31-2, ¶ 48).

At the direction of Human Resources, Daigle conducted an investigation, which involved interviewing Plaintiff and the other employees at the DCI clinic. At the time she conducted this investigation, Daigle was not aware of the identity of the employee who called the hotline and complained about Wilcutt. (R. Doc. 31-2, ¶ 49).  Overall the investigation revealed that Wilcutt talked down to staff members, raised her voice on the floor, and discussed confidential employee information openly.  Some staff members reported that Wilcutt was not always fair, but they did

9

not feel that it was race related. (R. Doc. 31-2, ¶ 50).  As a result of the investigation, BMA concluded that the while Wilcutt did not hold employees equally accountable, her decisions were not racially motivated. (R. Doc. 31-2, ¶ 51).

On May 5, 2013, Wilcutt was placed on a PIP for releasing confidential employee information, engaging in inappropriate communication on the clinic floor in front of staff and patients, and being perceived by some staff to display favoritism at times. (R. Doc. 31-2, ¶ 52).

In July 2013, a patient refused treatment from Plaintiff because of her poor treatment. (R. Doc. 31-2, ¶ 55).

On September 4, 2013, Plaintiff filed an EEOC Charge against BMA, alleging that while employed by BMA she was discriminated against because of her race and disability commencing on September 4, 2012. (R. Doc. 31-2, ¶ 54).

In February 2014, a patient refused treatment from Plaintiff because of her poor treatment and another inmate who worked at the clinic complained that Plaintiff cursed at him and talked down to him. (R. Doc. 31-2, ¶¶ 55-56).  During the investigation of the later complaint, a registered nurse noted that she often heard Plaintiff speak to patients inappropriately and two PCTs corroborated the patient's complaint that Plaintiff told him that "we're going to get some work out of your ass today." (R. Doc. 31-2, ¶ 59).  One of the PCTs corroborated the patient's complaint that Plaintiff told him "bye bitch" on February 4. (R. Doc. 31-2, ¶ 59).

On April 4, 2014, the Warden of DCI demanded that Plaintiff be removed from DCI due to her mistreatment of and verbal abuse toward inmates, including patients. (R. Doc. 31-2, ¶ 60). BMA issued a final written warning to Plaintiff and placed her on a three day suspension pending reassignment to another facility. (R. Doc. 31-2, ¶ 61).

On April 14, 2014, Plaintiff took a second medical leave and never returned to work. (R. Doc. 31-2, ¶ 62).

On August 25, 2014, the EEOC issued a right to sue letter. (R. Doc. 31-2, ¶ 63).

### C.    Title VII Claims

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race," among other things. 42 U.S.C. § 2000e-2(a)(1).  Title VII also makes it unlawful for an employer to retaliate against an individual for opposing discrimination or otherwise participating in activity protected by the statute. 42 U.S.C. § 2000e-3(a).  Disparate treatment claims and retaliation claims under Title VII typically utilize the *McDonnell Douglas* burden-shifting proof structure established by the Supreme Court. *See McDonnell Douglas, Corp. v. Green*, 411 U.S. 792, 802-03 (1973).[6]

### 1.    Racial Discrimination (Disparate Treatment)

For disparate treatment claims, the *McDonnell Douglas* framework requires a plaintiff to first establish a *prima facie* case of discrimination by demonstrating: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she was subject to an adverse employment action under circumstances giving rise to an inference of discrimination.  *Okoye v. Univ. of Texas Houston Health Science Ctr.*, 245 F.3d 507, 512-513 (5th Cir. 2011) (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999)).  Once established,

---

[6] Because the *McDonnell Douglas* framework is applicable to alleged violations of Title VII and other related statutes, the Court relies on relevant cases decided under all applicable statutes. *See, e.g., Turner v. Kan. City S. Ry.*, 675 F.3d 887, 891-92 (5th Cir. 2012) (applying *McDonnell Douglas* to Title VII); *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279 (5th Cir. 2000) (applying *McDonnell Douglas* to an ADA claim); *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010) ("While the Supreme Court has not definitively resolved whether it is, we are bound by our circuit precedent applying *McDonnell Douglas* to age discrimination cases.") (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 n.2 (2009) ("[T]he Court has not definitively decided whether the evidentiary framework of *McDonnell Douglas* utilized in Title VII cases is appropriate in the ADEA context.") (internal citations omitted)).

the burden shifts to the defendant to "produce admissible evidence that [its] decisions were based

on legitimate, nondiscriminatory reasons." *Turner v. Kansas City. S. Ry. Co.*, 675 F.3d 887, 900

(5th Cir. 2012); *see also McDonnell Douglas*, 411 U.S. at 802-803.  If the defendant carries its

burden, the plaintiff must then prove by a "preponderance of the evidence that the legitimate

reasons offered . . . were a pretext for discrimination." *Texas Dept. of Community Affairs v.

Burdine*, 450 U.S. 248, 253 (1981).

     In the context of establishing a *prima facie* case of discrimination, an adverse

employment action means an "ultimate employment decision such as hiring, granting leave,

discharging, promoting, or compensating." *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th

Cir. 2007) (quoting *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002)).[7]

Title VII does not cover "every decision made by employers that arguably might have some

tangential effect upon those ultimate decisions." *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320

F.3d 570, 575 (5th Cir. 2003) (quoting *Burger v. Central Apartment Mgmt.*, 168 F.3d 875, 878

(5th Cir. 1999)).  Changes in compensation, duties, and responsibilities can constitute ultimate

employment actions. *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 n. 8 (citing *Hunt v. Rapides

Healthcare Sys., LLC*, 277 F.3d 757, 770 (5th Cir. 2001)).  Allegations of unpleasant work

meetings and verbal reprimands do not constitute actionable adverse employment actions. *King

v. Louisiana*, 294 F. App'x 77, 85 (5th Cir. 2008) (citing *Burlington Northern*, 548 U.S. at 68);

*see also Liddell v. Northrop Gumman Shipbuilding, Inc.*, 836 F. Supp. 2d 443, 457 (5th Cir.

2011) (disciplinary warnings that did not result in any type of reduced wages, terminations, or

layoffs, or any other ultimate employment action are not actionable under Title VII).  "Transfers,

---

[7] The Supreme Court has abrogated the "ultimate employment decision" standard in the *retaliation* context.
*Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53, 61-65 (2006).  The "ultimate employment decision"
standard, however, remains controlling for Title VII discrimination claims. *McCoy*, 492 F.3d at 559-60.

denial of paid leave, and suspensions can all be ultimate employment actions." *Moore v. True Temper Sports, Inc.*, No. 10-178, 2011 WL 5507401, at *1 (N.D. Miss. Nov. 10, 2011) (suspension); *Pegram*, 361 F.3d 272, 283 (transfer); *Mota v. Univ. of Tex. Houston Health Sci. Ctr.,* 261 F.3d 512, 521 (5th Cir. 2001) (denial of paid leave).

BMA asserts that "[t]he only alleged acts of race discrimination of which Plaintiff complains are: "1) her perceived unwarranted discipline; 2) the denial of her requested work schedule; and 3) her work assignments." (R. Doc. 31-3 at 3). The Court has reviewed the deposition testimony referenced by BMA. Plaintiff testified she was discriminated against based on race in light of non-specific smoke breaks taken by white employees and that she faced unwarranted discipline, the denial of her requested work schedule, and unfair work assignments. (R. Doc. 31-4 at 33-35; R. Doc. 31-5 at 63-65). With respect to taking extended breaks for a "long time," Plaintiff acknowledges that "we all have done that." (R. Doc. 31-4 at 34). No explanation is given as to why Plaintiff alleges that this is discriminatory if all employees do it. Plaintiff also complains that a white employee was able to take sick leave when she became ill at work, but Plaintiff points to no instance where she was denied the ability to take sick leave.

BMA argues that these acts do not constitute ultimate employment decisions that rise to the level of an "adverse employment action" for the purposes of discrimination under Title VII. (R. Doc. 31-3 at 3).

The Court agrees that Plaintiff has not established a *prima facia* case of discrimination. Plaintiff's deposition testimony, at most, provides that she was subject to threats of being fired, denials of work schedules and assignments, and unwarranted disciplinary warnings, but that these actions had no effect on her compensation, advancement opportunities or other terms of employment. Nothing more is provided by Plaintiff. These acts, even if true, are insufficient to

13

establish a *prima facie* case of disparate treatment because they do not constitute ultimate employment decisions.  In short, Plaintiff has not established any facts in the record that create a genuine issue of material fact regarding whether she suffered an adverse employment action.

Accordingly, BMA's Motion for Summary Judgment is **GRANTED** with regard to Plaintiff's claim of race discrimination pursuant to Title VII.

### 2.    Retaliation

For retaliation claims, "a plaintiff must first show that (1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action." *Feist v. Louisiana*, 730 F.3d 450, 454 (5th Cir. 2013) (citing *McCoy*, 492 F.3d at 556-57 (Title VII); *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999) (ADA)).  Once the plaintiff establishes a *prima facie* case of retaliation, "the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision." *Feist*, 730 F.3d at 454.  If the employer presents such a reason, "the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation" *Id*.  "In order to avoid summary judgment, the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." *Id*. (quoting *Long v. Eastfield College*, 88 F.3d 300, 308 (5th Cir. 1996)).

There is no dispute that Plaintiff's internal hotline complaint to BMA in April 2013 and the filing of her EEOC charge in September 2013 constitute "protected activity" under Title VII and the ADA. (R. Doc. 31-1 at 16).

With regard to an "adverse employment action," in the context of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action

materially adverse," meaning that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern,* 548 U.S. at 68 (quotation marks omitted).  "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*  "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case." *Id.* at 71.

BMA asserts that Plaintiff testified at her deposition that her suspension, write-ups, and the denial of her schedule requests constituted adverse employment action. (R. Doc. 33-1 at 16). Any admonishment or verbal disagreements with her supervisor were not materially adverse as they constituted "[m]ere work related reprimands." *See Brown v. Liberty Mut. Group*, 616 F. App'x 654, 658 (5th Cir. 2015) (citing *Mendoza v. Bell Helicopter*, 548 F. App'x 127, 130 (5th Cir. 2013).  Even assuming each of these incidents constitutes an adverse employment action, Plaintiff has not raised any genuine issues of material fact regarding whether she can establish a causal connection between her protected activity (the April 2013 hotline internal complaint and September 2013 EEOC charge) and her suspension, write-ups and schedule request denials.[8]

But even if Plaintiff could establish a causal connection and therefore a prima facie case of retaliation for each adverse employment action, BMA has raised legitimate, non-retaliatory reasons to rebut any presumption created by Plaintiff's prima facie case.  The record demonstrates that after Plaintiff engaged in protected activity (Plaintiff's hotline complaint and filing of an EEOC charge), various patients and other inmates complained about mistreatment by

---

[8] The Court notes that a causal connection is not established in this case based on temporal proximity.  The Fifth Circuit has held that where only about two months separates a plaintiff's protected activity and the adverse action, a *prima facie* case of retaliation is likely established. *See e.g.*, *Shirley v. Chrysler First Inc.*, 970 F.2d 39, 43 (5th Cir. 1992).  Here, the protected activity occurred in April and September of 2013, and Plaintiff's suspension occurred on April 4, 2014, respectively one year later and seven months later.

Plaintiff.  (R. Doc. 31-2, ¶¶ 55-61).  As a result of these complaints, BMA engaged in investigations revealing that Plaintiff was causing problems at the facility and amongst the staff. Moreover, the record demonstrates ongoing issues related to Plaintiff's mistreatment of patients throughout her employment.  These facts are uncontroverted by Plaintiff.  Plaintiff's suspension followed these complaints and investigation and was significantly after any protected activity.

To establish pretext, Plaintiff must demonstrate that BMA had a retaliatory motive resulting from Plaintiff's protected activity and that such motive was the but-for cause of the adverse action allegedly suffered. *See Valderaz v. Lubbovk County Hosp. Dist.*, 611 F. App'x 816 (5th Cir. 2015).  Plaintiff has not presented any evidence that raises a genuine issue of material fact regarding pretext.[9]  Plaintiff's retaliation claim, therefore, fails as a matter of law.

Accordingly, BMA's Motion for Summary Judgment is **GRANTED** with regard to Plaintiff's claim of retaliation pursuant to Title VII.[10]

### 3.       Racial Harassment (Hostile Work Environment)

"Where a harassment claim arises out of a supervisor's conduct, 'there are four elements of a hostile working environment claim: (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome [ ] harassment; (3) that the harassment was based on [a protected characteristic]; and (4) that the harassment affected a 'term, condition, or privilege' of employment.'" *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 453 (5th Cir. 2013) (en banc) (quoting *Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 162-63 (5th Cir. 2007)).  To establish a hostile work environment claim, the plaintiff must prove that his or her work environment "was permeated with discriminatory intimidation, ridicule, and insult so

---

[9] With respect to the hotline complaint and investigation in April of 2013, Daigle was not even aware the Plaintiff had made that complaint until after Plaintiff left employment. (R. Doc. 31-2, ¶ 18).
[10] To the extent the Petition can be construed as raising a retaliation claim pursuant to the ADA, the foregoing analysis is applicable to such a claim.

severe or pervasive as to alter the conditions of employment and create a hostile or abusive

working environment." *Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 287 (5th Cir. 2015)

(citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)); *Boh Bros.,* 731 F.3d at 453.

"Workplace conduct is not measured in isolation; instead, we look to: (1) the frequency of the

discriminatory conduct; (2) the severity; (3) whether it was physically threatening or humiliating

as opposed to mere offensive utterance; (4) whether it unreasonably interferes with an

employee's work performance; and (5) whether the workplace undermines the plaintiff's

workplace competence." *Jackson*, 601 F. App'x. at 287 (citing *Hockman v. Westward

Commc'ns, LLC*, 407 F.3d 317, 325-26 (5th Cir. 2004)).  "Properly applied, they will filter out

complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of

abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*,

524 U.S. 775, 788 (1998) (citation omitted).

Plaintiff testified that Wilcutt made various inappropriate comments and statements over

the course of the nearly four years that Wilcutt served as her manager.  Specifically, Plaintiff

testified that Wilcutt: once referred to Plaintiff and two other employees sitting at a desk together

as "three little monkeys" and asked if this was "monkey see and monkey do?" (R. Doc. 31-4 at

15-16); she said that she would "whip" Plaintiff's and/or another employee's "black ass" or

"black butt" on a couple of occasions (R. Doc. 31-4 at 16; R. Doc. 31-5 at 43-44); she called

Plaintiff "gal" on occasion (R. Doc. 31-4 at 17); she told Plaintiff that she was "used to working

hard" and called her a "workhorse" on one occasion (R. Doc. 31-4 at 75; R. Doc. 31-5 at 45); she

would discuss how she did not like how her stepdaughter dated black men (R. Doc. 31-5 at 45);

she commented that Plaintiff was not "all the way black" in light of her hair on two occasions (R.

Doc. 31-5 at 45-46); she commented once that she was disappointed when a black man she dated

did not have a large penis (R. Doc. 31-5 at 48-49); and she once commented that Plaintiff's

pressure sleeve was black like the color of Plaintiff's arm (R. Doc. 31-5 at 55).

Plaintiff did not testify that these statements were frequent and, in fact, testified that

many of the statements occurred in isolation or are at most episodic incidents over the course of

four years.  The comments do not involve threatening conduct.  While many of the comments are

insensitive and condescending, they do not involve threatening conduct, as opposed to mere

offensive utterances.[11]  The Court is also not satisfied that all of these comments, despite

Plaintiff's disapproval, are directed to Plaintiff's race.  Furthermore, there is no evidence that any

such comments interfered with Plaintiff's work performance and are so extreme as to "amount to

a change in the terms and conditions of her employment." *See Faragher*, 524 U.S. at 788.

Assuming that there is a genuine issue of material fact regarding whether Wilcutt's

comments can support a hostile work environment claim, there is no evidence that the alleged

harassment culminated in a tangible employment action.  As such, even if Plaintiff could show a

hostile work environment, BMA may avoid liability if it can establish the two-part

*Ellerth/Faragher* affirmative defense.  *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 765

(1998); *Faragher*, 524 U.S. at 807.  "[This] affirmative defense consists of two prongs, both of

which the employer must fulfill: (a) that the employer exercised reasonable care to prevent and

correct promptly any [] harassing behavior, and (b) that the plaintiff employee unreasonably

failed to take advantage of any preventive or corrective opportunities provided by the employer

---

[11] This Court recognizes that offensive words have the capability to cause great distress and offense.  The Court is also aware, however, of the Fifth Circuit's prior decisions regarding the use of offensive language and its relation to whether a hostile work environment exists.  *See, e.g.*, *White v. Gov't Employees Ins. Co.*, 457 F. App'x 374, 380 (5th Cir. 2012) (isolated use of the term "n--ger" referencing a client and references to an office as a "ghetto" or a "FEMA trailer" did not rise to the level of severity or pervasiveness required to support a hostile work environment claim); *Johnson v. TCB Constr. Co.*, 334 F. App'x. 666, 671 (5th Cir. 2009) (finding insufficient evidence to establish a racially hostile work environment where supervisor made an isolated comment that the plaintiff was just "like a damn n--ger" and supervisor's frequent use of the term "n--ger" were not uttered in the plaintiff's presence and there was no evidence that they affected the plaintiff's job).

or to avoid harm otherwise." *Watts v. Kroger Co.*, 170 F.3d 505, 509–10 (5th Cir. 1999).  The

employer bears the burden to prove both elements by a preponderance of the evidence. *Aryain v.

Wal-Mart Stores Texas LP*, 534 F.3d 473, 482 (5th Cir. 2008) (citing *Ellerth*, 524 U.S. at 765).

The first prong of the defense is satisfied by implementing suitable institutional policies

and educational programs regarding harassment. *See, e.g.*, *Lauderdale*, 512 F.3d at 164; *Wyatt v.

Hunt Plywood Co.*, 297 F.3d 405, 413 (5th Cir. 2002).  "While proof that an employer had

promulgated an antiharassment policy with complaint procedure is not necessary in every

instance as a matter of law, the need for a stated policy suitable to the employment circumstances

may appropriately be addressed in any case when litigating the first element of the defense."

*Ellerth*, 524 U.S. at 765.  The court will often look to an employer's policies and programs in

determining whether it took reasonable measures to prevent discriminatory behavior. *See, e.g.,

Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 437-39 (5th Cir. 2005); *Hockman v.

Westward Commc'ns, L.L.C.*, 407 F.3d 317, 329-30 (5th Cir. 2004).

Here, there is no dispute that the first prong is satisfied, as BMA has a comprehensive

anti-harassment policy, which prohibits harassment based on race and instructs employees to

report perceived discrimination or harassment to their supervisor, Human Resources, or by

calling the hotline. (R. Doc. 31-2, ¶¶ 3-7; R. Doc. 31-7 at 20-27).

There is also no dispute that the second prong is also satisfied.  Plaintiff testified that she

reviewed the Employee Handbook, and was aware that it was available for her review during her

employment. (R. Doc. 31-4 at 51; *see* R. Doc. 31-4 at 83).  Nevertheless, Plaintiff did not report

in her call to Human Resources or call to the hotline any of the alleged racial comments or

conduct of Wilcutt.  During the investigation of the 2010 call to Human Resources, Plaintiff told

Daigle that she did not think Wilcutt was a racist.  (R. Doc. 31-4 at 26-27; R. Doc. 31-3, ¶ 11; R.

Doc. 31-7 at 5-6).  Plaintiff specifically testified that on her call to the hotline she did not recall complaining about racial comments. (R. Doc. 31-5 at 59-60).  By failing to raise her complaints of a hostile work environment through the appropriate channels, plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities provided by BMA.

Based on the foregoing, BMA's Motion for Summary Judgment is **GRANTED** with regard to Plaintiff's claim of harassment pursuant to Title VII.

**D.    ADA Claims**

The ADA prohibits discrimination against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  A plaintiff is a "qualified individual" under the ADA if he or she is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

 "To prevail on a claim of discrimination based on failure to accommodate a disability, the plaintiff must show that (1) the employer is covered by the statute; (2) she is an individual with a disability; (3) she can perform the essential functions of the job with or without reasonable accommodation; and (4) the employer had notice of the disability and failed to provide accommodation." *Blackard v. Livingston Par. Sewer Dist.*, No. 12-704, 2014 WL 199629, at *5 (M.D. La. Jan. 15, 2014) (citing *Mzyk v. North East lndep. Sch. Dist.*, 397 F. App'x 13, 16 n. 3 (5th Cir. 2010) (citations omitted)).[12]

---

[12] Plaintiff raises no allegations of an ADA violation based on hostile work environment and/or retaliation.

"Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds or desires" and "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). In other words, essential functions are those "basic" to the job. *See Myers v. Hose*, 50 F.3d 278, 282 (4th Cir. 1995) (essential function of a "bus driver is to operate his motor vehicle in a timely, responsible fashion"). Evidence of whether a function is essential includes, but is not limited, to (1) the employer's judgment as to which functions are essential; (2) written job descriptions; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the person to perform the function; and (5) the current experience of holders of similar jobs. *See* 29 C.F.R. § 1630.2(n)(3).

The ADA requires employers to make "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). "The ADA does not [, however,] require an employer to relieve an employee of any essential functions of his or her job . . . reassign existing employees to perform those jobs, or hire new employees to do so." *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999) (holding employer was not required to accommodate firefighter who could not fight fires); *see also Barber v. Nabors Drilling U.S.A., Inc.,* 130 F.3d 702, 709 (5th Cir. 1997) ("We cannot say that [an employee] can perform the essential functions of the job with reasonable accommodation, if the only successful accommodation is for [the employee] not to perform those essential functions."). "As a matter of law, it is an unreasonable accommodation for the employer to have to exempt the employee from performance of an essential function of the job." *Jones v. Kerrville State Hosp.*, 142 F.3d 263, 265 (5th Cir. 1998) (citing *Barber*, 130 F.3d at 709). "For the accommodation of a reassignment

21

to be reasonable, it is clear that a position must first exist and be vacant." *Silva v. City of Hidalgo, Tex.*, 575 F. App'x. 419, 423 (5th Cir. 2014) (quoting *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997)).

There is no dispute that cancer and lymphedema qualify as disabilities under the ADA. *See EEOC v. Womble Carlyle Sandridge & Rice, LLP*, No. 13-46, 2014 WL 2916851 (M.D.N.C. June 26, 2014) (lymphedema); 42 U.S.C. § 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."); 29 C.F.R. § 1630.2(j)(3)(iii) ("the following types of impairments will, at a minimum, substantially limit the major life activities . . . cancer substantially limits normal cell growth"); *Norton v. Assisted Living Concepts, Inc.*, 786 F. Supp. 2d 1173, 1185 (E.D. Tex. 2011) (cancer, even if in remission, qualifies as a disability because cancer, "when active, substantially limits the major life activity of normal cell growth").

It is also uncontested that an essential function of Plaintiff's job was to perform heavy lifting, well in excess of 4 pounds, on a regular basis: "The position provides direct patient care that regularly involves heavy lifting and moving patients. . . [t]he employee may occasionally be required to move, with assistance, machines and equipment of up to 200 lbs., and may lift chemical and water solutions of up to 30 lbs. up as high as 5 feet." (R. Doc. 31-4 at 79). Plaintiff further testified that heavy lifting was required of her as a PCT no matter her placement. (R. Doc. 31-5 at 30).

Here, Plaintiff requested to be relieved of the duty to lift objects over 4 pounds or, alternatively, be reassigned to a secretarial position to accommodate her disability. (R. Doc. 31-5 at 38-39). First, the secretarial position that Plaintiff requested was occupied by another employee at the time of the request and a vacant position could not otherwise be identified as an

22

accommodation. (R. Doc. 31-5 at 33).  Accordingly, the denial of this request did not violate the ADA. *Silva*, 575 F. App'x at 423.  Moreover, the record reflects that the secretarial position would have required the same heavy lifting as any other PCT position.

Second, the record demonstrates that Plaintiff's request to be relieved of lifting anything over 4 pounds was not a reasonable accommodation, given the particular circumstances of her job and working environment. (R. Doc. 31-5 at 29-33).  Specifically, Plaintiff testified that there was not a single PCT position or shift assignment that did not involve heavy lifting. (R. Doc. 31-5 at 29-31) (each PCT is assigned to work on 1 of 5 "rows" during a shift and each "row" involved heavy lifting); (R. Doc. 31-5 at 31) (Q: "Was there any row that you could be assigned to that would not involve heavy lifting?"; A: "I would say not really.").

While some of the other PCTs helped Plaintiff with heavy lifting when they could, the record is uncontroverted that this accommodation was not reasonable under the circumstances and could not be maintained.  Specifically, it was disruptive to have other PCTs carry Plaintiff's workload on top of their own. (R. Doc. 31-4 at 41, 50); (R. Doc. 31-5 at 29). The ADA does not require BMA to continue modifying the lifting requirements of the PCT position as that accommodation is not reasonable under the circumstances given the particular working environment. *See Magnant v. Panelmatic Texas, Inc.*, 2006 WL 2434475, *14 (S.D. Tex. Feb. 22, 2006) (citing *Holbrook v. Alpharetta,* 112 F.3d 1522, 1528 (11th Cir. 1997)).

As no evidence has been put forth that a reasonable accommodation of the essential function of heavy lifting was feasible, BMA's Motion for Summary Judgment is **GRANTED** with regard to Plaintiff's claim of failure to accommodate pursuant to the ADA.

**IV.     Conclusion**

For the foregoing reasons,

**IT IS ORDERED** that Plaintiff's Motion to and for Leave to Exceed Page Limits and Motion to Strike the Incorrect Pleading and Allow Filing Out of Time Memorandum in Opposition to Summary Judgment. (R. Doc. 52) is **DENIED**.

**IT IS FURTHER ORDERED** that BMA's Motion for Summary Judgment (R. Doc. 31) is **GRANTED**, and Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

Signed in Baton Rouge, Louisiana, on September 15, 2016.

_____
**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**